NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0718n.06
Filed: November 20, 2008

Nos. 06-6070/07-5335

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| AMBROCIA OROZCO-TORRES, | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| Defendant-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETE ARCIBAR ROCHA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: GILMAN, SUTTON, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Ambrocia Orozco-Torres appeals his sentence following his guilty plea to a drug-conspiracy charge. Pete Arcibar Rocha appeals both his conviction and sentence arising out of the same conspiracy. We affirm.

I.

A.

Orozco-Torres and Rocha each played a role in a cocaine-distribution conspiracy that started in the border town of Brownsville, Texas, and ended in Nashville, Tennessee. The conspiracy began in March 2005, when the Nashville police and the United States Immigration and Customs Enforcement Agency (ICE) used a confidential informant to arrange a purchase of cocaine from two men in Nashville. Those two men then contacted three other persons in Texas—Mark Anthony Garcia, Rita Martinez, and Maria Villareal—to arrange a delivery of three kilograms of cocaine from Brownsville to Nashville.

Rocha's role was to transport the cocaine. He worked as a bus driver for Adame Bus Lines, a passenger-bus company with regular routes from Mexico to various cities in the United States. Garcia met Rocha at the Brownsville bus station, and gave him a backpack containing three kilograms of cocaine. Rocha placed the bag in the driver's luggage area on the front seat of the bus. Rocha then drove the bus to Houston, with Garcia onboard as a passenger.

In Houston, Rocha and Garcia met Martinez and Villareal, and the four of them boarded an Adame bus for Nashville. Rocha did not drive on this trip, but again stored the backpack in the driver's luggage area. Upon reaching Nashville, they checked into a motel. There, Rocha learned that the final sale of the cocaine would not be completed until several days later, so he left Nashville. Rocha was supposed to be paid $2,000 for his role in transporting the cocaine, but Garcia paid him only $500 at that time because the deal had not yet been completed.

Orozco-Torres entered the picture a few days later. He had arrived in Nashville from Mexico one day before the cocaine sale was to be completed. He learned of the deal from one of the Nashville purchasers—his brother-in-law—at whose apartment he was staying. Orozco-Torres also

met the other Nashville purchaser that same day, and told him that he would like to participate in the sale because his brother-in-law "had never done this kind of deal[] and he didn't know about . . . these things."

The next day, the confidential informant went to the apartment to complete the sale. The informant was wearing a transmitting device, which was monitored by ICE agents. In a conversation overheard by the agents, Orozco-Torres negotiated with the informant about how the transfer of cocaine for cash would occur. Orozco-Torres then ordered two other men to retrieve the cocaine from the motel at which Garcia, Martinez, and Villareal were staying. Surveillance agents observed the men go to the motel and pick up Garcia, who was carrying a black backpack. The men returned to the apartment, and showed the informant three kilograms of cocaine in the bag.

Police then entered the apartment and arrested all of the conspirators present, including Orozco-Torres. Martinez and Villareal were arrested at the motel, and their room was searched. In their purses, agents found a business card with Rocha's name on it, and two pictures of Rocha, one of him in front of an Adame bus.

ICE agents learned that Rocha would be driving a bus to Nashville a few weeks later. Two agents met him at the bus station and told him that his name had come up in an investigation of a cocaine-trafficking investigation. Rocha agreed to go with the agents to their office for an interview. There, he made inculpatory statements—telling the agents that he helped transport the cocaine, and that he was paid for his role in doing so.

Rocha was not arrested immediately following his interview, but was driven back to the bus station by the agents. Rocha was arrested several days later and charged with conspiracy to distribute

and possession with intent to distribute cocaine, and aiding and abetting the possession with intent to distribute cocaine.

B.

1.

Prior to his trial, Rocha moved to suppress the inculpatory statements that he made to the ICE agents. At a hearing on his suppression motion, Rocha testified that the agents had told him at the bus station that "if I was willing to cooperate with them . . . I won't be arrested." He testified that he later signed a *Miranda* waiver of rights form, but that it was his understanding that he was signing that form as a "trade" for not getting arrested. He further testified that he asked the agents at the station if he needed an attorney, and they told him that if he was willing to cooperate, "[n]o, you don't need one."

The agents disputed both assertions. Each testified that they had not made any promises to Rocha that he would not be arrested or prosecuted. They also testified that Rocha had never asked for an attorney, and, indeed, had read and signed a *Miranda* waiver of rights form, indicating that he understood his rights and was willing to talk to the agents without an attorney present. It is also undisputed that Rocha was never handcuffed, that the agents told Rocha he was not under arrest at that time, and that Rocha rode in the front seat of the agents' car to and from the police station.

The district court denied Rocha's motion to suppress the inculpatory statements, finding his testimony not credible. Specifically, with respect to Rocha's testimony regarding the agents' alleged promise not to arrest him if he cooperated and signed the waiver of rights form, the court found:

I am finding that to not be credible and not supported by the facts for the following reasons. First of all, the form doesn't say that. The agents didn't testify accordingly, so there is a conflict in the testimony there, and I am finding that Mr. Rocha's testimony in that regard is not credible. It is just not an objective basis for a promise of not being arrested for signing a form.

The court also found that another aspect of Rocha's testimony—that he had asked for a lawyer but was told he did not need one—was "particularly not credible in light of his signing and initialing the waiver of rights form." It was undisputed, the court observed, that Rocha had signed a waiver of rights form and understood that he could have had a lawyer if he had wanted one. The court found that Rocha's testimony contradicted the testimony of both of the agents, and was not credible.

Rocha's case proceeded to a jury trial, following which he was convicted of both charges. Rocha's presentence report calculated his Sentencing Guidelines range to be 78 to 97 months' incarceration. Rocha objected to the report's failure to include a four-level offense reduction for being a "minimal participant" in the drug conspiracy under U.S.S.G. § 3B1.2. The government objected to the report's failure to include a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

The district court overruled Rocha's objection to the report's failure to include a four-level minimal-participant reduction, but granted him a two-level reduction as a "minor participant" in the conspiracy. The court granted the government's request for a two-level enhancement for obstruction of justice. Noting that it had "previously found that Mr. Rocha was not credible[,]" the court found that his testimony "was intentionally false, and that rises to the level of obstruction of justice." The district court then sentenced Rocha to 78 months' incarceration.

2.

For his part in negotiating the drug transaction, Orozco-Torres pleaded guilty to conspiracy to distribute and possess with intent to distribute cocaine.  His presentence report calculated his Guidelines range as 100 to 125 months' incarceration.  Orozco-Torres objected to the report on several grounds, including its failure to include a minimal-role reduction, its failure to reduce his criminal history category on the grounds that it allegedly overstated his propensity to commit crimes, and its failure to grant a downward departure on the grounds that his incarceration would have an "extraordinary effect on innocent family members."  The district court overruled all of these objections, and sentenced Orozco-Torres to 100 months' incarceration.

These appeals followed.

II.

A.

Rocha appeals both his conviction and his sentence.  Rocha first argues that his conviction should be vacated because the district court refused to suppress his inculpatory statements.  He contends the statements were not voluntary because his "will was . . . overborne by illusory promises" by the agents, to the effect that he would not be arrested if he cooperated with them.  We review the district court's factual findings for clear error, and its determination of voluntariness *de novo*.  *United States v. Marks*, 209 F.3d 577, 581 (6th Cir. 2000).

"In determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning whether a defendant's will has been overborne."  *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).  "Police promises of

leniency . . . can be objectively coercive," rendering a confession involuntary. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003). But "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).

Rocha's inculpatory statements were freely and voluntarily given. As an initial matter, Rocha does not argue that he was in custody when he gave the statements. To the contrary, he admits that he agreed to go with the ICE agents to the bureau station, that they told him he was not under arrest, that he was never handcuffed, and that he rode in the front seat of the agent's car to and from the station. The "compulsion inherent in custodial surroundings" was absent, therefore, and the pre-interrogation warnings mandated by *Miranda* were not required. *Miranda*, 384 U.S. at 458. Moreover, Rocha concedes that the agents read him his *Miranda* rights, and that he signed a waiver-of-rights form, indicating that he was willing to answer questions without a lawyer present.

Rocha's argument, instead, is that his "will was overborne" by the agents' alleged promise that he would not be arrested if he agreed to cooperate. But the district court specifically found the predicate for this argument—that the agents made such a promise—to be incredible. We have no basis to hold that finding to be clear error. Under the totality of the circumstances, therefore, Rocha's statements were "given freely and voluntarily without any compelling influences," and properly admissible against him at trial. *Miranda*, 384 U.S. at 478.

B.

1.

Rocha also appeals his sentence.  He argues that the district court erred in imposing a two-level obstruction-of-justice enhancement, and in failing to grant a four-level "minimal participant" reduction.  In reviewing an enhancement under U.S.S.G. § 3C1.1, we review the district court's factual determinations for clear error, its "determination that certain conduct constitutes obstruction of justice" *de novo*, and its application of the enhancement *de novo*.  *United States v. Baggett*, 342 F.3d 536, 540-41 (6th Cir. 2003).

Section § 3C1.1 provides for a two-level enhancement where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice."  U.S.S.G. § 3C1.1.  The notes to § 3C1.1 recite "committing, suborning, or attempting to suborn perjury" as examples of obstructing justice.  U.S.S.G. § 3C1.1 cmt. n. 4(b).  A defendant commits perjury when, testifying under oath, he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Dunnigan*, 507 U.S. 87, 94 (1992).

In *Dunnigan*, the Supreme Court acknowledged the "concern that courts will enhance sentences as a matter of course whenever the accused takes the stand and is found guilty."  *Id.* at 97.  To protect against this risk, the Court held that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition."  *Id.* at 95.  The Court recognized that "[w]hen doing so, it is preferable . . . to address each element of the alleged perjury in a separate and clear finding," but "[t]he district court's determination that enhancement is required is sufficient . . . if . . . the court

makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Id.*

We have added additional requirements. For a district court to enhance a defendant's sentence under § 3C1.1, the court must: "1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002). With respect to the first requirement, however, we "have never insisted on a rigid adherence to its terms," and "a district court's findings will be adequate if: 1) the record is sufficiently clear to indicate which statements the district court considered perjurious; and 2) the district court found that the statements satisfied each element of perjury." *Id.*

Here, Rocha testified under oath at a suppression hearing that ICE agents told him that "if I was willing to cooperate with them . . . I won't be arrested." He further testified that he asked the agents if he needed a lawyer, and they told him, "[n]o, you don't need one." The district court found at the hearing that "those pieces of testimony by Mr. Rocha aren't credible, particularly not credible in light of his signing and initialing the waiver of rights form." At sentencing, the district court referenced these findings, saying that "[o]n the obstruction of justice enhancement, the Court previously found that Mr. Rocha was not credible. In the opinion of the Court his testimony was intentionally false, and that rises to the level of obstruction of justice, so I'm granting that objection."

Rocha argues that these findings were not specific enough under *Dunnigan* and *Lawrence*. He cites our decision in *United States v. Spears*, 49 F.3d 1136 (6th Cir. 1995), where we held that

a sentencing judge's general finding that a defendant's entire testimony was not credible was not specific enough to warrant an obstruction of justice enhancement.

In Rocha's case, however, the "record is sufficiently clear to indicate which statements the district court found perjurious." *Lawrence*, 308 F.3d at 632. The district court specifically found "not credible" two material aspects of Rocha's testimony—that he asked for a lawyer and that the agents promised him he would not be arrested—and then referenced that finding at sentencing. Thus, unlike *Spears*, there is no ambiguity in the record here regarding the statements that the district court found perjurious.

Those statements also "satisfied each element of perjury." *Id.* The district court expressly found that the cited testimony was "intentionally false"—thus satisfying the "willful" element of perjury. Although the court did not address the "materiality" of the testimony, that element generally is a question of law in this setting. *See United States v. Seymour*, 38 F.3d 261, 264 (6th Cir. 1994) (where a district court's findings "encompass all elements of perjury except materiality, *Dunnigan* does not require a remand because materiality is a question of law"). Any error, at any rate, was harmless because the element is plainly met here; Rocha's perjury formed the *basis* for his suppression motion.

The district court's findings therefore "encompass[ed] all of the factual predicates for a finding of perjury," and thus satisfy the rules set forth in *Dunnigan* and *Lawrence*. The district court did not err in imposing a two-level obstruction of justice enhancement.

2.

Rocha further argues that the district court erred in denying him a four-level reduction to his offense level as a "minimal participant" in the conspiracy under U.S.S.G. § 3B1.2(a). The district court did, however, grant Rocha a two-level reduction as a "minor participant" under § 3B1.2(b).

Section 3B1.2 provides:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

The reduction for a minimal participant "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." *Id.* cmt. n. 4. A reduction for a minor participant "applies to a defendant . . . who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* cmt. n. 5.

The commentary to the Sentencing Guidelines cautions that "[i]t is intended that the downward adjustment for a minimal participant will be used infrequently." *Id.* cmt. n. 4. "[T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." *Id.*

"This court will not disturb the district court's determination of a defendant's role in the criminal activity unless it is clearly erroneous." *United States v. Williams*, 940 F.2d 176, 180 (6th

Cir. 1991). The defendant bears the burden of proving by a preponderance of the evidence that he was a minimal participant in the offense. *United States v. Salas*, 455 F.3d 637, 643 (6th Cir. 2006). The issue, therefore, is whether the district court clearly erred in determining that Rocha failed to prove that he was a minimal—rather than a minor—participant in the offense.

The district court made no such error. Rocha's role in the cocaine-trafficking conspiracy was to transport the cocaine from Brownsville to Nashville. That was an essential role. He used his position as a commercial bus driver to store the cocaine during its transport in the driver's luggage area, where it was less likely to be searched by customs agents. He traveled with three other members of the conspiracy—knowing their roles—and successfully delivered the cocaine to Nashville. He was paid $500 for his services. Rocha thus played a significant role in the conspiracy and knew the role of others in it. That takes him beyond the scope of a minimal participant. The district court's determination that Rocha had not met his burden of proving that he was a minimal participant, therefore, was not clearly erroneous.

C.

Orozco-Torres appeals only his sentence. Like Rocha, he first argues that the district court erred in failing to grant him a mitigating-role reduction. His argument fails as well.

In his plea agreement, Orozco-Torres stipulated to the fact that he "negotiated with the informant over how the transfer of cocaine for cash would occur," and the fact that he "ordered" two other co-conspirators "to get the cocaine and bring it to the apartment." The district court rightly relied on these facts in finding that Orozco-Torres was not a minimal or minor participant. Orozco-Torres was not "plainly among the least culpable of those involved" in the conspiracy, U.S.S.G.

§ 3B1.2 cmt. n. 4, thus precluding a reduction as a minimal participant. And he was not "less culpable than most other participants," U.S.S.G. § 3B1.2 cmt. n. 5—given that he gave orders to at least two of them—thus precluding a reduction as a minor one. The district court did not err in denying the requested reduction.

Orozco-Torres next argues that the district court erred in failing to grant a downward departure under U.S.S.G. § 4A1.3(b)(1). That section provides that a downward departure may be granted "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). In making this determination, the district court can consider the types of prior convictions, the age of the convictions, and signs of rehabilitation. *United States v. Fletcher*, 15 F.3d 553, 557 (6th Cir. 1994). We review the district court's determination only for clear error. *Id.* at 556.

This argument is meritless. Orozco-Torres has seven prior convictions, including ones for drug possession, possession of a handgun while under the influence, and possession with intent to distribute cocaine. He committed all these offenses between 1999 and 2002—and indeed in the 26 months during that period when he was not in prison. It understates matters to say that the district court's determination on this issue was not clearly erroneous.

Orozco-Torres also argues that his family circumstances "warranted a downward departure." He asserts that his incarceration will have a negative effect on his wife and child, who rely on him for support. We have held that "[e]xtraordinary and special family circumstances may justify a downward departure in exceptional cases." *United States v. Tocco*, 200 F.3d 401, 435 (6th Cir.

2000). But this case is not exceptional; the conduct of criminals often has severe, harmful effects upon their families. The district court did not err on this issue.

Finally, Orozco-Torres challenges the reasonableness of his sentence. We review his sentence for both procedural and substantive reasonableness, "under a deferential abuse-of-discretion standard." *Gall v. United States*, __U.S.__, 128 S.Ct. 586, 591 (2007). A sentence is procedurally unreasonable if the district court:

> commit[s][a] significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence–including an explanation for any deviation from the Guidelines range.

*Id.* at 597.

In reviewing the substantive reasonableness of the sentence, we "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* If the sentence fell within the Guidelines, we apply a "rebuttable presumption of substantive reasonableness." *United States v. Wilms*, 495 F.3d 277, 280-81 (6th Cir. 2007).

Orozco-Torres' sentence was procedurally and substantively reasonable. The district court acknowledged the advisory nature of the Guidelines, considered the § 3553(a) factors, and properly calculated a Guidelines range of 100 to 125 months' incarceration. The court then sentenced Orozco-Torres at the bottom of the Guidelines range, 100 months, which it determined in its discretion to be reasonable under the totality of the circumstances. We agree.

### III.

For the foregoing reasons, we affirm the district court's judgments in both cases.